(No. 5589—

CHARLES and HAROLD EICHEN, Claimant, *vs.* STATE OF ILLINOIS, DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Respondent.

*Opinion filed August 7, 1975.*

JAMES R. POTTER, Attorney for Claimant.

WILLIAM J. SCOTT, Attorney General; WILLIAM E. WEBBER and DOUGLAS G. OLSON, Assistant Attorneys General, for Respondent.

BURKS, J.

This claim is for damages to property, a sawmill in Macoupin County near Carlinville, owned and operated by the Claimants, Harold and Charles Eichen. The complaint alleges that, as a result of a fire set on October 7, 1968, the sawmill, including a storage building, logs, lumber, tools and other material were destroyed, total damage being in the amount of $25,000. The fire was allegedly set by Ora Hash, a ward of the Respondent, who escaped custody.

Ora Hash, at age 15, became a ward of the Department of Children and Family Services by order of the Circuit Court of Peoria County, entered on May 28, 1968; and Herschel L. Allen, Chief of the Division of Child Welfare, Department of Children and Family Services, was appointed his legal guardian with power and responsibility to place and provide for the care and supervision of the ward.

Prior to becoming a ward of the State, Ora Hash had been living in a relative's home under the supervision of the Circuit Court of Peoria County. He and another boy had been picked up for breaking and entering, and the Court removed him to the Gift Avenue Detention Home in Peoria.

Ora Hash came from a difficult home situation. Both of his parents died, and he was accepted by an uncle who was very permissive in his parental responsibility. He moved often—from Kentucky to Tennessee, to

Florida, and back to Kentucky. Ora Hash was never adequately supervised, a fact which contributed to his emotional instability. He went to live with an aunt who was unable to control or supervise him and was returned to his uncle. Ora later went to live with another aunt and uncle in Glasford, Illinois.

While in Glasford, Ora Hash and another boy ransacked the Glasford grade school and committed serious vandalism: spraying paint, breaking furniture, windows, and generally tearing up the school. These boys also broke into the Glasford Lumber Yard, stole a number of items, and tore up the place. Thereupon, the Court removed him to the Gift Avenue Detention Home.

After becoming a ward of the State, Ora Hash remained in the Gift Avenue Detention Home for about a month until a boarding home could be found. At the Detention Home Ora was difficult to handle. He would threaten to do things, according to the record, but there is no explanation of the type of things he threatened to do in this particular home. They did not want him to remain.

From the Gift Avenue Detention Home, Ora Hash went to the Horton Foster Home in Tremont, where they found Ora was a very negative influence on other teenage boys. He smoked incessantly. There were further threats reported with no explanation as to what those threats were. Once again, this home would not keep Ora, and he was sent back again on an emergency basis to be placed at the Gift Avenue Detention Home. He was then placed in the Raymond Hanby Foster Home in Oak Hill. At both the Horton and Hanby Homes, Ora showed a tendency to run away, and he would make more threats when throwing one of his temper tantrums, which were frequent.

An example of the type of threats Ora would make

was finally given in a belated departmental inter-office memorandum, written two months after Ora had caused Claimant's fire loss. It stated that Ora formerly had a part-time job for a few days on a farm. When told that he might not be paid because of the poor quality of his work, Ora replied that, if he wasn't paid, "he might burn down the barn." At another time he told the foster parents that "during the night he might get up and knock them in the head."

The Department sought another new home for Ora Hash. On October 1, 1968, he was accepted as "an emergency-type placement" at Peaceful Valley Youth Ranch at Carlinville. This was the fourth institution for Ora in five months as a ward of the State.

The complete history of Ora Hash was not known to the Director of Peaceful Valley Ranch until after Ora was admitted "because of the dire need of the Department to place him as soon as possible." The director was Mr. Larry F. Renetzky. Mr. Renetzky, whose educational background includes a master's degree in social work, had been a lay minister prior to joining the Department of Children and Family Services, where he was supervisor of a district office. He had helped Reverend Blackburn develop this home for boys. Mr. Renetzky had administrative and supervisory responsibility over the entire staff at Peaceful Valley.

Peaceful Valley Ranch is a private child placement home licensed by the Department of Children & Family Services, is sponsored by WORK, Inc., a not-for-profit corporation, and the Ranch charges a monthly fee for its services. The Ranch is not a closed institution. There are no fences or other restraints to prevent boys from leaving the premises, nor can the Ranch accept a boy that would exhibit a pathology requiring a real structured and closed environment. The boys attend school in Car-

linville, just like other children of that community, and it was from school that Ora Hash "escaped" on October 7, 1968, to burn down Claimants' sawmill.

In accepting the placement of Ora Hash at Peaceful Valley, Mr. Renetzky had agreed to do a diagnostic workup for the Department to determine whether Ora was the type that they could handle at the Youth Ranch or whether he should be placed elsewhere.

The Department had provided a brief report regarding Ora's mode of conduct, and Mr. Renetzky agreed that it did indicate possible destructive behavior of some sort. He also thought that a psychological and psychiatric workup would also be in order, and this was requested. However, he was told that he would have to go through the Mental Health Center; that there was a long waiting list, and that due to funds being frozen by the State at this particular point, the Department of Mental Health could not provide the psychological and psychiatrict evaluation.

A few days after Ora Hash arrived at Peaceful Valley, Ora picked up a hatchet and threatened to kill another boy. "It nearly scared this boy to death," Mr. Renetzky said. Ora also threatened the house father, stating that he would "burn Peaceful Valley down, and would kill everybody in it." Mr. Renetzky attempted to reach the local district office of the Department of Children and Family Services to request an immediate replacement of Ora Hash. Unfortunately, this was on a weekend. Mr. Renetzky also tried to contact the Peoria office and was unable to do so.

On the following Monday, Ora Hash did not stay in school. That morning he set fire to the Eichen Brothers Lumber Mill. The fire completely destroyed the lumber mill and the forest surrounding the lumber mill. Ora Hash also set fire to a barn housing farm machinery.

Later in the afternoon, he came in and admitted setting fire to the lumber mill and also the barn. Ora's admission was made to Mr. Renetzky and the Macoupin County Sheriff.

Mr. Renetzky told the Department of Children and Family Services that Ora was so emotionally disturbed, and in such dire need of treatment, that he should be housed in Peoria State Hospital or confined temporarily in a jail. When the Department's Mr. Durward Guth was removing Ora from Peaceful Valley Ranch to Zeller Zone Center in Peoria, Ora explained to Mr. Guth just how he started the fire that destroyed Claimants' property. Ora was then confined to the Peoria State Hospital where a psychiatric analysis showed, among other things, that Ora was a pyromaniac.

Mr. Renetzky who previously worked for the Department of Children and Family Services for six years testified that if he had been provided with detailed background information concerning Ora's destructive propensities, he would have exercised more caution and supervision in light of his problems.

Claimants support their claim for damages on more than one theory of liability. First, Claimants contend that the legislature has recognized absolute liability, independent of common law negligence, for damage done by an escaped inmate who is institutionalized by departments or agencies of this State. Claimants cite the following statute:

AN ACT concerning damages caused by escaped inmates of charitable, penal, reformatory or other institutions over which the State has control. *Ill.Rev.Stat., Ch. 23, §4041.*

4041. Claims. Whenever a claim is filed with the Department of Mental Health, the Department of Children and Family Services, or the Department of Corrections for damages resulting from personal injuries or damages to property, or both, or for damages resulting from property being stolen, heretofore or hereafter caused by an inmate who has escaped from a charitable, penal, reformatory or other institutions over which the State has control

while he was at liberty after his escape, the Department . . . shall conduct an investigation to determine the cause, nature and extent of the damages and if it be found after investigation that the damage was caused by one who had been an inmate of such institution and had escaped, the Department may recommend to the Court of Claims that an award be made to the injured party and the Court of Claims shall have the power to hear and determine such claims.

With considerable logic, Claimants compare the above statute with the law of strict tort liability applied to storage of explosives or the recently developed area of products liability. Claimants argue, "if a business or a government stores, sells or houses persons or things which are in themselves inherently dangerous, the business or government should bear the loss of damage to persons or property rather than the person victimized."

Respondent questions the applicability of the above statute on the grounds that Ora Hash was not an "inmate and did not "escape" from an "institution". We do not find much support for this contention in our dictionary. We do, however, accept Respondent's contention that the above quoted statute does not impose absolute liability, but rather the test is one of fault.

See—American States Insurance Company and Union Automobile Indemnity Association v. State, 23 Ill.Ct.Cl. 47; Huff v. State of Illinois, 22 Ill.Ct.Cl. 36.

Using the test of fault, Claimants contend that Respondent was negligent in placing an emotionally disturbed child with dangerous and destructive tendencies in an unstructured licensed child care institution. We believe the facts in this particular case support Claimants' contention as to Respondent's negligence.

This Court fully appreciates the difficult task of carrying out the policy and purpose stated in the *Juvenile Court Act, Ill.Rev.Stat. Ch. 37, §701-2.* It obligates the Respondent to balance the sometimes conflicting interests of a child and the safety of the community. We have often resolved doubtful cases in favor of the

decision maker as in *American States, et al.* In the case at bar, Respondent suggests that its course of action might have been different if it had the benefit of 20-20 hindsight vision. Hindsight, of course, does often magnify acts of negligence that might go unnoticed if they produce no disaster.

In this case we find that Respondent was negligent in failing to exercise a reasonable degree of foresight in the light of their ward's past record. Respondent failed to ascertain at the time it became guardian of Ora Hash whether or not he exhibited pyromaniac or other tendencies of a violent nature which would have required that he be confined in a structured environment, be given the mental care his condition demands, and the public safety protected.

The conduct of Ora Hash in the first three institutions in which he was placed after becoming a ward of the State should have warned the Respondent that Ora was not qualified for placement at Peaceful Valley Ranch, and that such placement involved a foreseeable risk to life and property. The police report of Ora's larceny and vandalism before he became a ward of the State was part of his record. His numerous difficulties, threats of violence, and total inability to adjust at the several foster homes before going to Peaceful Valley were known to the State. Failure to make a full disclosure of all the facts to the director at Peaceful Valley was a further act of negligence.

We do not accept Respondent's general proposition that a full disclosure of a ward's case history to a foster parent should not be required "if to do so would seriously mitigate against the placement of the child or a third person's acceptance of responsibility for the child's welfare." It seems to us that failure to disclose essential facts would amount to fraud in the inducement.

The case at bar can be distinguished from the New York case cited by the Respondent, *Seavy v. State of New York, 216 N.E.2d 613,* although the facts are strikingly similar:

Claimants, who owned a dairy farm, filed a claim against the State for the destruction of barn and contents by fire set by mentally retarded young man, on ground that the Claimants accepted custody of the young man as a farm worker because of alleged misrepresentation of the character of the young man by the State's agent, and on ground that the State was negligent in transferring the young man to the Rome State School, which is operated by the State Department of Mental Hygiene for the care and training of mentally retarded individuals.

The New York Court of Claims, William G. Easton, J., entered a decision dismissing the claim after a trial, and the owners of the dairy farm appealed.

The Appellate Division, Goldman, J., entered an order which, by a divided court, affirmed the judgment entered on the decision of the Court of Claims, and held that the burning of the barn was unforeseeable from the young man's past history of quick temper and disagreeable behavior and one incident of suffering burns after having spilled cleaning fluid on his body, and that the State was not liable though details of entire past history of the young man had not been disclosed to the Claimants. Williams, P.M., and Bastow, J., dissented.

We believe the case at bar differs from the above New York case in the foreseeability of the risk involved. To the extent that it does not, and on the issue of full disclosure, we would agree with the dissenters in the New York Appelate Division.

We can agree with that court's finding that the burning of a barn was unforeseeable based on their young man's past history of "quick temper and diagreeable behavior." That would be a mild description of the record of Ora Hash. Ora had commmitted a violent crime just before he became a ward of the State; was found to be uncontrollable by four institutions; had made repeated threats to commit murder and arson; and, after the last threat was carried out, was found to be a pyromaniac. This determination was much too long delayed.

We must assume that the State's failure to disclose full details of the ward's entire past history was not a decisive factor in the New York case quoted above. In any event, we believe the rule is properly stated by the California Supreme Court in *Johnson v. State, 69 Cal.2d 782; 447 P.2d 352.* As that rule would be applied here, the State owed a duty to fully inform Mr. Renetzky of all matters that its agents knew or should have known that might cause Ora Hash to endanger the persons or property of the residents of Macoupin County.

The facts in this particular case do establish that the State failed to exercise a reasonable degree of care in the light of its ward's admitted propensities for violence which existed before the fact which caused Claimants' loss. This is not to say that the State is an insurer against any loss that might be caused by a ward or inmate any more than the parole board should be held to guarantee that a parolee will commit no further crimes. See our recent opinion in *Flaim v. State, Ill.Ct.Cl. No. 5442, filed June 11, 1975.*

On the question of damages, the only testimony before this court is that of the Claimants and their appraisers. Claimant Harold K. Eichen testified that, as a result of the fire, the brothers had to pay $600.00 to the fire department to come to the scene of the fire, and lost income of $7,825.00 as a direct result of their sawmill being burned by Ora Hash. Mr. Eichen also testified that he did receive insurance proceeds of $400.00. J. Glen Meyers who had operated a sawmill himself for some 20 years testified that the buildings that were destroyed had a fair market value of $5,000.00; that the "sawmill" had a fair market value of $4,000.00; the edger was valued at $1,500.00; saw blade at $2,292.00; and logs and lumber in inventory at $594.00. Isqdore Bertinetti testified that the pulleys,

belts, motor and tools that were destroyed had a minimum value of $4,312.00.

The appraisers testified that the figures given were either minimum replacement values or the fair market value of the various items that were destroyed in the fire. The total of the income lost, equipment, tools and buildings that were destroyed in the fire is $26,123.00. This figure, reduced by the $400.00 received by the Eichens from their insurance carrier, reduces the total loss to the amount of $25,723.00. Respondent does not contest the accuracy of this figure as fairly representing Claimants' actual pecuniary loss.

At the time of Claimants' loss, the statutory limit on awards for damages in tort cases was $25,000. Since the operation of the sawmill was a partnership, Harold Eichen and Charles Eichen are each entitled to be awarded one-half of said compensable loss.

Claimants are hereby awarded damages for their property loss as follows: Twelve Thousand Five Hundred Dollars ($12,500) to each Claimant.

To Charles Eichen the sum of $12,500.

To Harold Eichen the sum of $12,500.